### The State of Rhode Island and Providence Plantations, Complainants, v. The Commonwealth of Massachusetts

The state of Rhode Island filed a bill against the commonwealth of Massachusetts, claiming that the boundary between the two states should be settled by the Supreme Court, according to the provisions of the original charters of the states, respectively; stating that the line which had been agreed upon by the commissioners acting for the states while colonies, had been agreed to by the commissioners of Rhode Island, under a mistake, and setting forth the charters of both the states, the proceedings of the commissioners, the acts of the legislatures respectively, and many other matters connected with the subject in controversy. To this bill the state of Massachusetts entered a general demurrer. The demurrer was overruled.

It is one of the most familiar duties of a Court of Chancery to relieve against mistake; especially where it has been produced by the misrepresentations of the adverse party.

The demurrer of the state of Massachusetts to the bill of Rhode Island, admits the charter lines of both the states to have been three miles south of Charles river; that the place marked, and from which the line was agreed to be run, was seven miles south of the river, instead of three miles, and was fixed on by mistake; and that the commissioners of Rhode Island were led into this error by confiding in the misrepresentations of the commissioners of Massachusetts. Now if this mistake had been discovered a few days after the agreement was made, and Rhode Island had immediately gone before a tribunal having competent jurisdiction to relieve against a mistake committed by such parties, can there be any doubt that the agreement would have been set aside, and Rhode Island restored to the true charter line? Agreements thus obtained, cannot deprive the complainant of territory which belonged to her, unless she has forfeited her title to relief, by acquiescence or unreasonable delay.

In the bill of Rhode Island, claiming to have an adjustment of the boundary between her and the state of Massachusetts, allegations are made of the interference of certain causes which prevented her resorting to measures for relief against a mistake as to the boundary line, alleged to have been established by the commissioners of Rhode Island and Massachusetts. The state of Massachusetts, by the demurrer, admits these facts as stated; and the facts asserted in the bill of Rhode Island must be taken as true. It is, therefore, not necessary to decide whether they are sufficient to excuse the delay. But when it is admitted by the demurrer that Rhode Island never acquiesced, but has from time to time made efforts to regain the territory by negotiations with Massachusetts, and was prevented by the circumstances she mentions, from appealing to the proper tribunals to grant her redress, the Court cannot undertake to say the possession of Massachusetts has been such as to give her a title by prescription; or that the laches of Rhode Island has been such as to forfeit her right to the interposition of a Court of Equity.

In cases between individuals, where the statute of limitations would be a bar at law, the same rule is undoubtedly applied in a Court of Equity. And where the fact appears on the face of the bill, and no circumstances are stated which take the case

U 2                    30

out of the operation of the act, the defendant may, undoubtedly, take advantage of it by demurrer; and is not bound to plead or answer.

The time necessary to operate as a bar in equity, is fixed at twenty years by analogy to the statute of limitations.

It would be impossible to adopt the same rule of limitations in the case before the Court on these pleadings. Here two political communities are concerned, who cannot act with the same promptness as individuals. Other circumstances in the case interpose objections. The boundary, in question, was in a wild, unsettled country, and the error in fixing the line not likely to be discovered until the lands were granted by, the respective colonies; and the settlements approached the disputed line. And the only tribunal that could relieve, after the mistake was discovered in 1740, was on the other side of the Atlantic, and was not bound to hear the cause and proceed to judgment, except when it suited its own convenience. The same reasons that prevent the bar of limitations, make it equally evident that a possession so obtained and held by Massachusetts, under such circumstances, cannot give a title by prescription.

THIS case was before the Court, at January term, 1838, 12 Peters, 657; and again, at January term, 1840, 14 Peters, 210.

A bill was filed in the Supreme Court, on the 16th of March, 1832, by the state of Rhode Island, and Providence Plantation, asking the Court to settle the boundary between that state and the commonwealth of Massachusetts.

Mr. Webster appeared for the commonwealth of Massachu-setts.

After various proceedings in the case, a plea and answer to the bill of the state of Rhode Island were filed by the commonwealth of Massachusetts; and, at January term, 1838, Mr. Webster, counsel for the commonwealth of Massachusetts, "moved to dismiss the bill, on the ground that the Supreme Court had no jurisdiction in the cause." A full report of the matters contained in the bill, and in the plea and answer, will be found in 12 Peters, 659—669.

The question of jurisdiction was argued by Mr. Austin, Attorney General of Massachusetts, and Mr. Webster, on the part of the commonwealth of Massachusetts; and by Mr. Hazard and Mr. Southard, for the state of Rhode Island.

The Court ordered that the motion to dismiss the bill of the complainants should be overruled.

Afterwards, at the same term, 12 Peters, 755, Mr. Webster, in behalf of the state of Massachusetts, as her counsel and attorney in Court, moved for leave to withdraw the plea filed in the case

on the part of the state of Massachusetts, and also the appearance which had been entered for the state.

The Court, after argument, on the 24th Feb. 1838, 12 Peters, 761, ordered, " That if the counsel for the state of Massachusetts shall elect to withdraw the appearance heretofore entered, that leave for the same be and was given; and the state of Rhode Island may proceed ex parte. But that, if the appearance be not withdrawn, that then, as no testimony had been taken, the parties be allowed to withdraw or amend the pleadings, under such order as the Court should thereafter make in the premises.

The appearance of the state of Massachusetts was not withdrawn; and the case was argued, on the sufficiency of the plea, at January term, 1840: the bill of the complainants having been amended. 14 Peters, 210.

On the 8th of January, 1841, the state of Massachusetts, by Mr. Austin, the Attorney General of the Commonwealth, and Mr. Webster, " for himself," filed the following demurrer to the complainant's bill:

The defendant, by protestation, not confessing all or any of the matters and things in the complainant's bill of complaint contained to be true, doth demur to the said bill, and for cause of demurrer, showeth:

"That no case is stated by the bill authorizing this Court to grant the relief sought, or any other relief;

That no such mistake or fraud is averred in the bill, as is sufficient to set aside the awards and agreements between the parties, therein stated, nor any other cause or reason sufficient for that purpose; and that these awards and agreements conclude the question:

That the bill states nothing which can do away the effect of the possession by Massachusetts up to the line asserted by her to be the true line, which possession the bill itself admits to have been continued for more than a century, and which possession is itself conclusive on the title:

That the bill states no case for the interference of this Court, with the line of division actually existing between two independent states, fixed by treaty, compact, or agreement between them, and acquiesced in for a century, as is true of this case, according to the bill itself:

That this Court has no power or jurisdiction to disturb or interfere with a boundary line actually existing between two states, well known and defined, and resting on early compact and long continued acquiescence and possession, upon any allegation of fraud or mistake in the original transaction.

Wherefore, and for divers other good causes of demurrer, appearing in the said bill, the defendant doth demur thereto, and asks the judgment of the Court, whether said defendant ought to be ordered to make any further or other answer to said bill; and prays to be hence dismissed with costs."

The demurrer was argued by Mr. Austin, and Mr. Webster, for the state of Massachusetts; and by Mr. Randolph, and Mr. Whipple, for the state of Rhode Island and Providence plantations.

Mr. Austin, for the respondents, in support of the demurrer.

The object of the plaintiff is, by a decree of this Cour., to be confirmed and established in the title, jurisdiction, and sovereignty, which she sets up to a portion of territory, now and ever heretofore, in the possession, jurisdiction, and sovereignty of the respondent.

The bill describes this disputed territory with reasonable accuracy, so that it is seen to be included between the present actual southern boundary of Massachusetts, and a line nearly parallel thereto, drawn between three and four miles due north from it, along the whole border of Rhode Island, comprising an area of about one hundred square miles.

The bill does not state that this territory is densely inhabited, and under a high state of improvement; but if the Court could judicially understand that it is occupied by seven thousand people, all of whom, as did their ancestors to remotest time, deem themselves to be citizens, and most of them native citizens of Massachusetts; and that there is upon it not less than a million of dollars of taxable property; the importance of the controversy could not be doubted.

The bill sets forth the alleged title of Rhode Island to the territory in dispute, and claims it as included in the charter of Charles II. It describes accurately the title of Massachusetts to the territory secured to her by her colonial and provincial charters, the one granted in 1629, and the other in 1691; and al-

leges that her southern boundary is by a line, "three English myles on the south parte of the rivir called Charles rivir, or of any or every parte thereof;" and further alleges that the southern boundary of Massachusetts, and the northern boundary of Rhode Island, is by the same line; the one being contiguous to the other. All this is true.

The bill avers that the actual line of possession on the part of Massachusetts, is more than three miles; viz.: seven miles south of Charles river, and of any and every part thereof. On this allegation, it is obvious the whole assumed merits of the plaintiff's case depend. If it be not true, there is no pretence of right to disturb the ancient and existing possession of the respondent.

Whether it be true or not, in point of fact, must depend on a legal construction of the words of the charter. As illustrative of that question, and not in the present aspect of the case, for any purpose of deciding it, the maps and plans of the territory heretofore used, and now before the Court, may be referred to.

By universal admission, the Charles river has one main, or principal stream, which is supplied by other streams or branches. If these latter streams, which have also local names, are any part of Charles river within the meaning of the charter, then the actual line of Massachusetts, which is within three miles of the principal branch, (sometimes locally called Mill river, at others, Jack's Pasture brook;) is the true boundary by her charter. If the main stream, and not the head waters, is alone entitled to be termed "Charles river, or any and every part thereof," then unquestionably the actual line of Massachusetts is not in conformity with the charter; because, in ancient times, it was assumed, and now is believed to be true, that the true point of offset for the protraction, southwardly of the line of three miles from any part of Charles river, is from the most southerly stream, branch, or head waters of the river, and it was accordingly so drawn. It is believed that such is, and ever was the universal acceptance of the terms; and that wherever a different construction was put on the like phraseology, it was the construction made by power in violation of right.

But the case now stands before the Court on demurrer; and in this form of pleading, the counsel for Massachusetts very well understand that this question of fact is not open to discussion.

They are bound by the allegations of the bill, and must proceed to a hearing with this fact, pro hac vice, against them; and with an admission that the line of actual possession is not the true line of the charter. It is with full confidence in the opinion that the bill, (even admitting this great and fundamental error on the part of Rhode Island, to be received as she has stated it,) does not set forth a sufficient cause for the interposition of this Court; that Massachusetts has ventured to waive this consideration for the present; and to deny that even on this presumption, Rhode Island has any title, by her own showing, to the territorial jurisdiction which she demands by her bill. We suppose, indeed, this is already settled by this Court in effect, though not in form. The bill incorporates the defence of Massachusetts, on two other points; which, independent of the original accuracy of the boundary, are each, by itself, fatal to the plaintiff's demand. It admits the fact of an amicable settlement in 1710 and 1718, and the further fact of an actual possession on the part of Massachusetts, under and by virtue of such agreements, for now nearly a century and a half.

It is again obvious that the question of right between these parties depends,

1st. On the original correct location of the boundary line.

2d. On the effect of the agreements in establishing a boundary.

3d. On the undisturbed possession for more than one hundred years.

On the former hearing in this case, the respondent had filed a plea in bar, setting out, more fully than the plaintiff had done, the agreements of 1710, 1718; and relying up them as fair and perfect contracts, made fairly, with full and equal knowledge, and accompanied and followed by an undisturbed possession from the time they were made.

We understood the Court to overrule that plea, because it contained two defences instead of one; upon a strict application of the severest rules of chancery practice, which, with great respect, we had contended could not apply to a case like the present, and were in no case applicable to the plea in the form in which it was presented.

In pronouncing the opinion of the Court, the Chief Justice said, " The defence set up by the plea is twofold :

1st. That there was an accord and compromise of a disputed right.

2d. Prescription, or an unmolested possession for more than one hundred years.

These two defences are entirely distinct, and depend upon different principles."

And after considering them separately, the Chief Justice further remarks, " Here, then, are two defences in the same plea, contrary to the established rules of pleading."

And again, upon the form of pleading, the opinion of the Court is to the following effect :

" A plea in general supposes that the bill contains equitable matter, which the defendant, by his plea, seeks to displace. It is according to this principle of equity pleading that we have treated the case before us. If a defendant supposes that there is no equity in the bill, his appropriate answer to it is a demurrer; which brings forward at once the whole case for argument. The case of Milligan *v.* Mitchell, 3 Cranch, 220. 228, illustrates this rule, and shows that the defence here taken was more proper for an answer or demurrer than a plea.

" If the defendant supposes that the bill does not disclose a case which entitles Rhode Island to the relief she seeks, the whole subject can be brought to a hearing by a demurrer to the bill.

\*        \*        \*        \*        \*        \*        \*

The whole case is open, and upon the rule to answer which the Court will lay upon the defendant, Massachusetts is entirely at liberty to demur or answer, as she may deem best for her interests."

It seemed to us that the Court, having thus decided, not, indeed, that we had the two valid defences set forth in our plea, but that, if in truth we did possess them, either was in itself a bar, though both could not be joined in the then present form; permitted, if they did not invite us to present them under such form as would authorize a joinder of both, and a consideration of either, independent of the other  We had hope, therefore, that the plaintiff, having, as we think, admitted both in his own

declaration, would have been satisfied that whenever they were considered they would of necessity prevail.

The demurrer now joined presents these defences, with all others growing out of the plaintiff's own statement of the case. It is a familiar and well established principle, that if, taking the allegations to be true, the bill would be dismissed at the hearing, it may be dismissed on demurrer. Utterron v. Mair, 2 Ves. Jr. 95. The object of a hearing is only to inquire whether the allegations are proved, and the effect of them. When, therefore, if proved or confessed, a decree must be had for defendant; the defendant may safely admit them, and may therefore as safely demur to the whole bill. Kemp v. Prior, 7 Ves. Jr. 245. Brooke v. Hewitt, 3 Ves. Jr. 253. Verplank v. Cacuis, 1 N. Y. Cases in Chancery, 59. Unquestionably, the legal effect of the facts admitted by demurrer or proof, may be a subject difficult to settle; but in a clear case of want of title, or equity, the result of a demurrer must be in favour of the defendant.

If, therefore, it shall now appear to the Court, by the fair import of the plaintiff's admissions in his bill, that notwithstanding any departure from the charter boundary, for good and sufficient cause, the colonies of Massachusetts and Rhode Island, by their authorized agents, settled the location of boundary on this frontier, such settlement is valid; and the Court must dismiss the bill.

Again, it appears to the counsel of Massachusetts, that if without any regard to the unascertained line described on paper in the charter of King Charles I., or any regard to any claim or any settlement with her neighbours, Massachusetts, in ancient times, entered on the disputed territory, more than one hundred and thirty years ago, and has always possessed it, and exercised jurisdiction over it; that a title has been acquired by that possession, independent of all other title by grant or agreement, which this Court will not disturb. If the supposed agreement and the possession, or either of them, are admitted by the bill, it is then apparent on the face of the bill that the plaintiff has no cause of complaint, and on demurrer, the bill may be dismissed.

But in addition to these points of defence, the defendant has yet another on the face of the bill. The plaintiff, to recover, must depend on the strength of his own title, not on the weak-

ness of the defendant's.    The plaintiffs' title is set forth in the bill.    It mainly depends on the charter granted to Rhode Island by Charles II., on 8th July, 1663.

Now, if under the circumstances of the case set out in the bill, at the time this charter was granted, the disputed territory was not in law created a part of the colony of Rhode Island then established, the plaintiff must fail on demurrer.

That it never passed by such charter to the then new colony of Rhode Island, we think could be made very clear by other records and proceedings, which history has preserved; but the question for this Court to settle on the present state of the pleadings will be, how does the title of the plaintiff appear on her own allegation in her bill?

It is proposed, therefore, to sustain the following propositions.

I. That, on the face of the bill, it sufficiently appears that the colony of Rhode Island, and Providence Plantations, never had and charter title to the territory demanded.

II. That this territory never was any part of the state of Rhode Island.

III. That by the bill it sufficiently appears that if her title, as now claimed, ever vested by charter, still it is lost by force of the agreements of January, 1710, and October, 1718, and the proceedings of May, 1719, set forth therein.

IV. That there has been an adverse possession of more than one hundred years, apparent by the bill, which is conclusive against any other claim of title.

In considering the bill with reference to these propositions, two rules of law have an important bearing.

1. That although a demurrer admits all the facts well pleaded; it admits facts only, and not the conclusions of law.   Ford *v.* Peering, 1 Ves. Jr. 76. 78.   2 Madox Chanc. 224.

2. The plaintiff can have no better case on proof; and no remedy for any other case, than is stated in her bill.

This principle, however familiar, is in its exact application exceedingly important in this case.    It has recently received the attention of this Court.   Boon *v.* Childs, 10 Peters, 209.   See also 4 Mad. R. 21. 29.   3 Wheaton, 527.   6 Wheaton, 418.   2 Wheaton, 380.   2 Peters, 612.   11 Wheaton, 103.   6 Johns. R. 559. 563.   7 Peters, 274.

To the first .point then. How does Rhode Island claim the premises? Her title to any thing rests on her charter from Charles II., dated 8th July, 1663. In this charter she has no northern boundary, by natural objects or line of latitude.· She is bounded on- the southerly line of the Massachusetts colony or plantation. Where that line was, must be ascertained by examining the colony and plantation of Massachusetts; and in this position of the cause, it is admitted that the bill furnishes the only evidence. But it is well enough there stated. The colony of Massachusetts is the elder by thirty-five years. All the charters are set out in the bill. First, Is the grant of King James to the council of Plymouth, in 1621, in which the southern boundary ·is described as "lying within the· space of three English miles on the south part of the said Charles river, or of any, or of every. part thereof."

Next is the deed of the council of Plymouth, to Sir Henry Rosewell and others, 19th of March, 1628, with the same boundary. Again follows the confirmation deed of Charles I., dated 4th of March, 1629, with the same description. Boston was settled in 1630, and the mouth of Charles river is on the west side.of the city. Three miles south of it, would extend to Brookline, about thirty miles more northerly than the present claim of Rhode Island. It is not from the mouth of the river then, that. the offset of three miles is to be drawn. At.that period, and for many years after, the river was unexplored. The ancient maps, if it was proper to examine them, are all marvellously inaccurate. In 1646,. two persons called·Woodward and Saffrey, and denominated "skilful approved artists;" with or without authority, went into the interior to explore the country, make a map of it; (the map is before us, and has been lithographically copied by the council of plaintiff;) find the south branch of Charles river, measure three miles, and erect a monument in perpetual remembrance of the thing. All this they did. The bill shows it.

They established the boundary, to begin in latitude 41° 55'.

The monument; the supposed boundary; the line thence to be drawn; became known and notorious.

Governor Dudley, of Massachusetts, on a solemn occasion, sixty-eight years after, proclaimed it. Governor Jenks, of Rhode

Island, on the same occasion admitted it. All this is apparent on the bill.

This demarcation, and the notoriety of it, at that ancient time, in the wilderness, when it was important to draw a line, but of n importance where it should be drawn, was a practical construction of the charter, conclusive against all the world, unless indeed, the King of England might be an exception. He never objected, and his silence was consent.

Massachusetts, as the bill shows, being thus for twenty-one years without a neighbour, settled up to; and, in the language of that day, planted towards the line. Then the charter of Rhode Island was granted by Charles II., bounding the colony of Rhode Island on the southerly line of the "Massachusetts colony or plantation," making no mention of the Massachusetts charter; but assuming, by this new word "Plantation," for the first time applied to Massachusetts, that her actual occupation was her charter limits. The colony of Massachusetts was established by the royal charter, the plantation by the act of the people. The charter of Rhode Island, recognises the existence of Massachusetts as, at that time, she existed in fact.

If the grant to Rhode Island was intended to include the space north of Woodward and Saffrey's station, which is nowhere so declared in the bill, and cannot be supposed, it would not convey any title from a grantor out of possession, and could therefore give, in this disputed territory, no claim to the colony. It is fairly to be inferred, that when a new colony was to be erected at the south of Massachusetts, and was bounded on the said colony or plantation, all the facts of the case were known; and that the boundary was intended to conform to an existing state of things, which had so long been possessed under a demand of right.

For forty-three years, the colony of Rhode Island submitted and acquiesced in this location Now, although the title by possession forms a distinct subject of inquiry; yet, here it may be invoked, to show that Rhode Island took no part of this territory by her colonial charter. A charter, without possession under it, can form no evidence of title after the revocation of that charter, on the 4th of July, 1776. It is believed that the great respect paid

by this Court, in repeated cases, to the validity of crown grants, has not extended to give validity to any grant 'of which actual possession was not taken in a reasonable time; and that an adverse possession submitted to for forty-three years, is conclusive evidence that the territory in such adverse possession was not included in the terms of any other grant.

II. If this territory never passed to the colony, the state never had title to it; the claim of the state being only as successor to the colony.

III. It appears on the face of the bill, that a dispute arose between the two colonies in 1710, in regard to this line; and was settled by agreements or treaties of compromise, in 1710, 1718, 1719.

The bill distinctly alleges, 1st. A dispute or controversy.

2d. A commission to settle the controversy, commonly called the Roxbury commission.

3d. An unlimited authority to the commissioners of each colony by the legislature of each colony, to ascertain and settle the line.

4th. An actual settlement by an agreement, signed and sealed by the commissioners, so far as to fix a point of beginning; and to establish Woodward and Saffrey's monument as such point.

5th. That this settlement was a compromise; Massachusetts yielding one mile of soil in fee, and Rhode Island withdrawing all claim to jurisdiction over the disputed territory.

And the bill further admits a second commission, arbitrament, and award, or, more properly, a treaty; commonly called the Rehoboth agreement, by which other commissioners were appointed, with unlimited powers, to agree and settle the line "in the best manner they could;" and an agreement, as before, under seal, varying in some degree from the former, but precise, exact, and particular, and a subsequent running of the line accordingly, upon the earth's surface, being the line which, from that time to this, has been the actual dividing line between the two parties; and which the plaintiff now seeks to disturb. Having thus introduced the defendant's title into her bill, the plaintiff seeks to avoid it by several allegations. It is suggested not to have been within the legitimate power of the colonies to make an agreement of boundary. To this, the case of Penn v. Lord Baltimore, 1 Ves. 444, is a sufficient answer.

The most material allegation is, that the agreement or treaty was the effect of a mistake. This mistake is thus stated.

The Massachusetts commissioners represented to the Rhode Island commissioners that Woodward and Saffrey were skilful and approved artists, and in 1642 had ascertained the point or place three miles south of Charles river, or of any and every part thereof; and had there set up a stake; and the Rhode Island commissioners, relying on said representations, and believing them to be true, and verily believing the said point or place to have been correctly ascertained, and the said place where the said stake was alleged to have been set up as aforesaid, to have been three English miles from Charles river and no more; the commissioners signed and sealed the agreement, which established the line of boundary.

To this the respondent replies, that it is the true character of this transaction, and not the name given to it in the plaintiff's bill, that is to lay the foundation for annulling an agreement otherwise binding upon the contracting parties.

The facts alleged are admitted by the demurrer; but whether they are to be called, or whether they amount to a mistake, is a conclusion of law, to be determined by the Court.

Now it is certain that to settle the boundary according to those charters, the commissioners must first have decided whether the head waters were a part of Charles river. It is apparent, also, that Woodward and Saffrey had, in their proceedings, determined that the head waters were part of the river; they had set up their stake accordingly, and when the Massachusetts commissioners affirmed that it was in the right place, they only affirmed that the head waters were part of the river; and when the Rhode Island commissioners relied on said affirmation, and believed it to be true, they believed the same fact.

It is observable, that the bill nowhere declares that the representation so made by the Massachusetts commissioners was wilfully false, or was intended to deceive, or that the Rhode Island commissioners acted or believed in consequence of such representation. These material allegations are carefully avoided.

It does not appear that the Rhode Island colony intended to settle the line according to the charter, without variation; but, on the contrary, that the commission was to "revise and compro-

x 2

mise." It is not averred that the Rhode Island commissioners intended to conform to the charter; but, on the contrary, it appears they were disposed to make an amicable settlement, and to take, in fee simple, an equivalent for territorial jurisdiction.

It is thus plain, on the averments of the bill, that what the plaintiff has been pleased to term mistake, was knowledge, compromise, reasonable concession, and judicious settlement.

All the subsequent proceedings having reference to this, depend on the same facts, and are not materially varied by the form of the bill.

But if this was a mistake by these commissioners, what is its equitable effect? "It must not be understood that in equity every kind of mistake is relievable, for though equity will relieve against a plain mistake, or misapprehension, or ignorance of title, yet equity will not interpose if the fact is doubtful, or, at the time of the contract, equally unknown to both parties; or if there has been a long acquiescence under the mistake, and neither party aware of it." Fonblanque, vol. i. p. 116, note to book i., ch. 2, sec. 7.

It appears by the bill that Rhode Island reposed under this mistake for forty years, without discovering her wrongs.

But this agreement and the subsequent ones are treaties. Ward's Law of Nations, ch. 15, p. 139. Vattel, ch. 12, p. 192, sec. 154.

"They are of a class of contracts which are never void for the mistake of the negotiators." Ib. 193, sec. 157, 158. See cases cited to this point when this case was last before the Court, 14 Peters, 210.

There can be found few cases where the negotiators of a treaty of boundary are supposed to have made a mistake; and none, it is believed, where, for any such cause, the provisions of a treaty were ever deemed to be, or ever were suggested by diplomatists to be void.

It is part of the law of nations, that a treaty, once made, is irremediably conclusive. And the reason is, that it can be inquired about and explained only by itself. The peace of the world demands that it be an eternal estoppel between the parties.

The boundary of the United States, by the Treaty of Paris,

of 1783; the designation of the River St. Croix, by commission-ers under the Treaty of London, commonly called Jay's Treaty; and the results of the commission under the 4th article of the Treaty of Ghent, are all suspected, with more reason than the ancient treaty line of these colonies, to have been settled by mis-take; but who ever was guilty of the gigantic heresy of main-taining that a mistake could be inquired about in these national compacts, or that the discovery of the ignorance of the negotia-tors would nullify the contract?

The bill shows an undisturbed possession by Massachusetts for one hundred and thirteen years, under claim of title.

The controlling power of time is a part of the law of this case, and reference is made to the authorities cited at the former hearing.

In addition to these, there is now presented to this Court the written autographic opinion of Lord Mansfield, when Attorney General of England, in the year 1754, on the subject of this very boundary; in which that eminent jurist declares that "if the king approves the agreement, it is now too late for the parties to dis-pute it." 4th vol. Trumbull's MS. papers, Mass. His. Soc. Li-brary.

Possession alone, it is respectfully contended, in a case of this kind, uninterrupted and exclusive for more than a century, is not only a good title, but the best of all possible titles. No other title gives, or was ever pretended to give, any right to the British crown to make conveyance of land or empire, jurisdiction or sovereignty in this new world. By discovery or by conquest, possession was obtained, and hence possession became ultimate right. When this possession was parted with, the right was lost, at least in effect against all the rest of mankind but the royal authority. Now, this possession was lost to the crown, and was gained by Massachusetts before the colony of Rhode Island was planted, or her charter drawn upon parchment. It is against, therefore, her own possession, or the possession of her grantor, forever, that the plaintiff demands title.

It has been suggested that it is not against claim of possession. To this it is submitted that no claim of possession can ever be admitted or considered in a Court of Equity, but that claim that is made in conformity to judicial proceedings. While this prin-

ciple is universally true, it derives additional force from the fact, that there always was a paramount power capable of redressing the injuries of the plaintiff, if at any time such injuries have been made known.

From 1740 to 1776 there was a regular appeal allowed to the King in Council. From the adoption of the confederation until the existence of the Constitution of the United States, authority to redress such injury vested in Congress. From that time to the present, this high Court has been the arbiter of international controversies between the states of the Union. The bill admits that no judicial effort has been made to bring the dispute to an issue. Occasionally, indeed, Rhode Island has complained. Once in about every thirty-five or forty years; that is, once in every generation of statesmen, of which her soil has been prolific, she moaned over the loss of a right which she never possessed; but her murmurs never reached the temple of the law, and never were serious enough, or loud enough for that purpose.

She was too weak, or too feeble, or too poor, it may seem by the bill; and although we would not hear her enemy say this; yet, if it be admitted by demurrer, it is mere admission by form; for she never wanted the intellectual or moral qualities which such an exigency demanded.

But the admission of her distress may be safely made. It is as inoperative in law, as it is incredible in fact. Distress and embarrassment are no bars to the operation of time. Hovenden *v.* Lord Annesly, 2 Scho. and Lef. 632.

It remains only to inquire if the objections thus fatal on the face of the bill, may be taken advantage of by demurrer. To this point the Court is referred to the following cases: Mitford's Pleading, 99, 100. 102. 144, of the English edition. Kuypers *v.* Reformed Dutch Church, 6 Paige, 570. Humbert *v.* Trinity Church, 7 Paige, 195. Utterron *v.* Mair, 2 Ves. Jr., 95. Brooke *v.* Hewitt, 3 Ves. Jr., 253. Hardy *v.* Reeves, 4 Ves. Jr., 476. This case was reviewed and confirmed in Hovenden *v.* Lord Annesly, 2 Sch. and Lefroy, 632; and the opinion of the Lord Chancellor, 637, espesially noticed: Hodley *v.* Healey, 1 Ves. and Beames, 536. Brooks *v.* Gibbons, 4 Paige N. Y. Rep. 374. 1 Jacobs and Walker, 195.

Mr. Whipple, for the complainants; with whom was Mr. Randolph.

The object of the plaintiff's bill is to obtain possession of jurisdiction over a territory about four and a half miles wide, north and south, by about twenty miles long, east and west. This territory constitutes, we say, the northern border of Rhode Island, and is included in the charter granted to Rhode Island, by the crown of England.

On the contrary, it is contended by Massachusetts, that this territory constitutes her southern border, and is included in her charter. The object of the controversy, therefore, is to settle the dividing line between two coterminous states, so far as it involves the rights of the parties to jurisdiction. The right to the soil is not in dispute.

Massachusetts has demurred to the whole of the plaintiff's bill; and the question is, whether, taking the case as it is presented by that bill, Rhode Island is entitled to relief. The first and most obvious inquiry, therefore, is, what are the facts set forth in the bill?

The leading and prominent facts are, 1st, The charters of the crown to the two states of Massachusetts and Rhode Island. By the Massachusetts charter, her southern line or boundary, is declared to be "within the space of three English myles on the south parte of the saïde river called Charles river, or of any, or every, parte thereof." The northern boundary, or line, of Rhode Island, is declared by her charter to be, "And from thence by a straight line, drawn due north until it meets the south line of the Massachusetts colony; and on the north, or northerly, by the aforesaid south, or southerly, line of Massachusetts."

By the Massachusetts charter, dated in 1629, the said Henry Rosewell et al. are created "A corporation by the name of the Gvernor and Company of Massachusetts Bay;" "which said officers shall apply themselves to take care for the best disposing and ordering of the general business and affairs of, for, and concerning the said lands and premises hereby mentioned, to be granted, and the plantation thereof, and the government of the people thereof." It then provides for four meetings of the general Court each year, and authorizes them "To make laws and ordinances for the good and welfare of said company, and for

·32

the government and ordering of the said lands and plantations, and the people inhabiting, and to inhabit, the same."

The same emphatic language is used in the Rhode Island charter. It creates the freemen of Rhode Island a corporation with perpetual succession; prescribes the times and mode of choosing the Governor and members of the legislative assembly; and authorizes the Assembly "from time to time to make, ordain, &c., such laws, &c., for the government of the lands hereinafter granted, and for the government of the people who now inhabit, or may hereafter inhabit, the same." "To establish Courts to settle all matters within said colony."

Both charters, in their grants of legislative, executive, and judicial powers, closely and cautiously limit the exercise of those powers "to the said lands - hereby granted." The powers themselves differ very materially as to their extent. The powers granted to Massachusetts, and none other, by the very terms of the Massachusetts charter are to be exercised within "the said lands," described in the Massachusetts charter, and by officers chosen by the freemen of Massachusetts. The powers granted to Rhode Island, and none other, by the very terms of the Rhode Island charter, are to be exercised within "the said lands hereinafter mentioned," and by officers chosen by the freemen of Rhode Island. "And, further, our will and pleasure is, that in all matters of public controversy which may fall out between our colony of Providence Plantations, and the rest of our colonies in New England, it shall and may be lawful to and for our said colony of Providence Plantations, to make their appeals therein to us, our heirs and successors, for the redress of their grievances, in England."

By these charters the following important facts are established,

1st. That the first settlers of Massachusetts, and Rhode Island, were not independent individuals, tribes, or communities, who took possession by conquest, or otherwise, for themselves, over their respective territories, claiming and acquiring an original and inherent power of legislation therein; a power which they could consequently transfer to each other or to any third person or community.

2d. They took possession as subjects of the crown of England, of a portion of a country claimed to have been discovered by

England; they took possession for, and under the crown of England: that all the powers of legislation which they ever claimed, or exercised, was by express grants from the crown; that by accepting these grants they acknowledged the power of legislation to be in the crown; that to Massachusetts was granted the power to legislate over lands as far south as "three miles south of Charles river, and of any and every part thereof;" that to Rhode Island was granted the power to legislate as far north as the southernmost line of Massachusetts; that the power to legislate north of that line, was delegated by the Massachusetts charter to Massachusetts officers, who were to be chosen by Massachusetts freemen in a certain mode; that the power to legislate south of that line was delegated by the Rhode Island charter, to Rhode Island officers to be chosen by Rhode Island freemen in a different mode; that both these powers were entire powers, to be exercised by each in the mode, by the officers chosen, and at the times specified in the respective charters; that Massachusetts must exercise the powers over the lands, and all the lands specified in her charter; that Rhode Island was subject to the same rule; that, consequently, it was not competent for either Massachusetts or Rhode Island, by any agreement (not ratified by the crown) to vary those powers, or to enlarge or lessen the territory over which they were to be exercised; that in this respect they were like all other corporations, and like most other colonial governments; that the right to legislate was in the crown, the temporary exercise of it, alone, was in the colonies; and this exercise might be terminated at the pleasure of the crown.

There was not only no authority in the charters of either of these colonies to delegate any portion of their derivative powers; but there is an implied if not a positive prohibition against it, for in "all matters of public controversy which may fall out between our colony of Providence Plantations, and the rest of our colonies in New England, it shall and may be lawful to make their appeal to us, in England."

No subject can be considered of "public controversy" with more propriety than a dispute between two colonies in regard to their boundaries. Indeed it is impossible to reconcile the studied and cautious limitation of the powers granted, even down

to those almost of a police nature, with the supposition of a power to cede any portion of their territories. There was a double incapacity. Rhode Island was incompetent to sell, and Massachusetts incompetent to purchase territory, the jurisdiction over which was exclusively in the crown. It would be a startling proposition that Jamaica could cede to Bermuda the jurisdiction over a part of her island. Even the compromise of a disputed line, would derive all its validity from the express or implied ratification of the crown.

From these charters, then, we arm ourselves with the following facts to start with:

1st. That Massachusetts and Rhode Island, from the date of their charters, 1628 and 1663, down to 1775, were not sovereign independent states, but political corporations, possessed, as trustees for the people, and by grant from the crown of England, of jurisdiction over certain specified limits.

2d. That neither of the charters contained any authority to delegate this jurisdiction, or any portion of it, nor any authority to acquire jurisdiction over any other lands than those specified in their charters.

3d. That as these charters limit the south line of Massachusetts to "three miles south of Charles river, and of any and every part thereof," and grant to Rhode Island jurisdiction up to that line; that Rhode Island is still entitled to that line, unless it appears upon the face of this bill that it has been expressly ceded to Massachusetts, by the crown of England, or by Rhode Island, with the express or implied assent of the crown.

With this preparation we will approach the years 1710 and 1718, when the agreements, upon which Massachusetts relies, were made. Those agreements are copied into the bill, and were made by commissioners with full authority from the two states. After they were concluded by the commissioners, and the line run in 1718, to which Massachusetts has ever since claimed, they were accepted by the legislatures of both states; but never formally ratified. All the allegations in the bill, in relation to those agreements, whether true or untrue, in point of fact, must be taken for truth for all the purposes of this trial; because they are admitted by the demurrer. One material allegation is, "that a short time previous to the year 1709, the inhabitants of said

colony of Rhode Island, entered upon certain parts of said lands adjoining the northern boundary of said colony, and made improvements thereon, and grants thereof." The bill then states the existence of disputes between the inhabitants of the two states, in relation to the boundary line; and that, in consequence of said disputes between said inhabitants, the two colonial governments appointed commissioners to ascertain and settle the northern boundary line of said colony of Rhode Island; that these commissioners met at Roxbury, on the 19th January, 1711.

" That the Massachusetts commissioners then and there represented to the Rhode Island commissioners, that Woodward and Saffrey, skilful and approved artists, in 1642, had ascertained the point or place three English miles south of the river called Charles river, or of any and every part thereof, and had there set up a stake; and that the said Rhode Island commissioners, relying on said representations, and verily believing the said point or place to have been correctly ascertained, and the said place, where said stake was alleged to have been set up as aforesaid, to be three English miles, and no more, south of said Charles river, signed and sealed a certain writing, called an agreement in the words following."

The agreement itself sets forth the authority of the two governments conferred upon the commissioners, and a statement of the inducements to settle the dispute in an amicable manner, and then proceeds to state, " That they have mutually agreed, that the stake set up by Woodward and Saffrey, skilful approved artists, in 1642, and since often renewed, in lat. 41° 55', being three English miles distant southward from the southernmost part of the river, called Charles river, agreeable to the letters-patent for the Massachusetts province, be accompted and allowed on both sides, the commencement of the line between Massachusetts and Rhode Island, and to be continued between the governments in such manner as that, after it has proceeded between the two governments, it may pass over Connecticut river, at or near Bissel's house, as is decyphered in the plan and tract of the line by Woodward and Saffrey, now shown forth to us, and is remaining upon record in the Massachusetts government.

The bill then states that disputes still continued to exist between the inhabitants; that the boundary line still remained unsettled,

as said pretended agreement was never in any manner ratified or confirmed by said colony of Rhode Island; that new commissioners were appointed in 1717, with full powers to settle all disputes.; that these commissioners met at Rehoboth, in October, 1718; that the Massachusetts commissioners made the same representations in regard to the Woodward and Saffrey stations, being but three English miles south of Charles river, as were made by the former commissioners from Massachusetts; that the Rhode Island commissioners, fully confiding in these representations, signed the second agreement, commonly known as the Rehoboth agreement.

The agreement then states, " That the stake set up by Woodward and Saffrey, in 1642, upon Wrentham Plain, be the station or commencement to begin the line which shall divide between the two governments aforesaid; from which said stake, the line shall run so as it may, at Connecticut river, be two and a half miles southward of a due west line, allowing the variation of the compass to be nine degrees: which said line shall forever remain," &c.

The bill repeatedly states that the commissioners did not go upon the ground, nor cause the distance from Charles river to be measured, so as to ascertain whether the Woodward and Saffrey station was but three miles from the river or not. It also states that neither of these agreements were ever ratified by the legislatures of either of the colonies; that both said agreements, and all the proceedings of the Rhode Island legislature thereon, were founded on the belief that the Woodward and Saffrey station had been ascertained, by competent and skilful surveyors, to be but three miles from Charles river, and no more;" that such mistaken belief continued to exist until 1749, when commissioners were again appointed by both colonies. The act appointing the Rhode Island commissioners is set out in the bill. Its preamble is as follows:

" Whereas, the northern line of this colony has never been settled according to the royal charter: and whereas. divers persons have made application to this assembly, and have set forth their just right to be under the jurisdiction of this government, as dwelling within the bounds thereof; and that the province of

Massachusetts Bay have and do unjustly exercise jurisdiction over them. In order, therefore," &c.

The Rhode Island commissioners met at Wrentham, after giving the Massachusetts commissioners notice of the time and place; and after waiting for them two days, they commenced measuring the distance from the most southerly part of Charles river to the Woodward and Saffrey station, the starting point of the line agreed upon by the commissioners in 1710 and 1718, and instead of three miles from Charles river, as had been stated by the Massachusetts commissioners, and as was laid down upon the Woodward and Saffrey map, they found it to be over seven miles. These commissioners measured three miles due south from the most southerly part of Charles river, and from the point extended a line due west until it reached the Connecticut line. Upon this east and west line, only three miles south of Charles river, they erected various monuments. The Massachusetts commissioners refused any participation in the measurement of the distance of three miles south of Charles river, but adhered to the line established four miles farther south, by the agreements of 1710 and 1718.

Three lines, then, have been run between these two states. The first in 1710, by agreement of the commissioners of both parties, beginning at the Woodward and Saffrey station, " being three miles south of Charles river, agreeable to the letters patent for the Massachusetts province, and to be continued between the two governments in such manner that it may pass over Connecticut river at or near Bissel's house."

The second line was by the agreement of the commissioners of the two states, in 1718, and starting from the same point, the Woodward and Saffrey station, "from which said stake the dividing line shall run, so as it may, at Connecticut river, be two miles and a half to the southward of a due west line."

These two agreements differ materially in the course of the line, the first terminating at the west end, several miles farther south than the second.

The third line was run by the Rhode Island commissioners alone, (the Massachusetts commissioners having declined any agency in it,) in 1750, and not only its termination at the west end, but its commencement at the east end, was between four

and five miles farther north than the two former lines. It is alleged in the bill, that Rhode Island first discovered that the Woodward and Saffrey station was over seven miles south of Charles river, in 1749 or 1750, when this last line was run.

It is also alleged, in the bill, that Massachusetts took possession as far south as the line established in 1719, immediately after that period; and has been in the possession of the territory between that and the line run by the Rhode Island commissioners, in 1750, ever since 1719.

It is also stated, as a fact, " that the place from which said line was run, (the line of 1719,) was and is more than seven miles south of the river called Charles river, and of any and every part thereof."

Upon the whole facts, as stated in the bill, and admitted by the demurrer, the defendant contends that she is entitled to continue her possession of the disputed territory; 1st. Because jurisdiction over that territory, was ceded to her, by force of the agreements of 1710, and 1718. 2d. Because, having been in the actual possession of that jurisdiction, as the bill itself states, from 1719, down to the filing the bill in 1832, she has gained a title to jurisdiction, by possession and prescription.

All the material and important facts in relation to the first point: the legal effect of the agreements, standing by themselves, have been stated; except the allegation distinctly made, that these agreements were never ratified by the crown. We will now consider briefly the question, do these agreements, by themselves, infer any right to jurisdiction, over the territory in dispute?

A recapitulation of the facts bearing upon the validity of these agreements, may aid us in estimating the force of the opposite argument.

1. Massachusetts admits, that her chartered line on the south, is an east and west line, three miles south of Charles river; and that the north line of Rhode Island, by her charter, is the south line of Massachusetts. Consequently, she admits, that, by the express terms of the two charters, the territory in dispute belonged to Rhode Island, anterior to 1710, being all that territory lying more than three miles south of Charles river; and the south line of it, as claimed, and occupied by Massachusetts,

"more than seven miles from Charles river, and from any and every part thereof."

2. She admits that the two agreements of 1710, and 1718, establishing the Woodward and Saffrey station, were entered into under the representation by the Massachusetts commissioners, that the station had been fixed and established by skilful surveyors, and was but three miles from Charles river; that the map of these artists was produced by the Massachusetts commissioners, in confirmation of this representation; and that the Rhode Island commissioners, confiding in this false representation, entered into these agreements, under the full belief that said station was but three miles from Charles river; and no more. Massachusetts now admits that said station, and said line run from it, were more than seven miles from Charles river, and from any and every part thereof.

3. She admits that these agreements were never ratified by the crown of England; that the mistake was not discovered by Rhode Island, until 1749, or 1750, when her commissioners ran a line three miles south of Charles river, its course due east and west; and that Rhode Island has claimed to that line ever since.

These are the facts admitted by the pleadings, upon which the validity and binding effect of the agreements depend.

In the argument of that question, it has not been pretended, that such agreements between two individuals, would be binding, either in law or in justice. The misrepresentation of one party, and the mistake of the other, would render them a mere nullity.

The only ground upon which it is attempted to support them is, that they amount to a treaty between two sovereign states; and that it is a principle of the laws of nations, that all treaties are binding, whatever may have been the mistake of either party

We do not admit the existence of any such rule among nations. A practical difficulty in annulling treaties between sovereign states, founded on mistake, may arise from the absence of any common arbiter between them. But suppose a common arbiter, by the agreement of parties, fully authorized to settle any question of boundary between two nations of sovereign and independent power, and one of them should rely upon a treaty,

which it admitted was founded in a mistake of the other party, caused by its own misrepresentations; is there any tribunal in the civilized world that would sanction such a treaty? This Court is a tribunal established by the Constitution, to decide all such questions between the states, that have become parties to that Constitution. Was it the intention and design of the Constitution, that this Court should decide without regard to any fixed principles of law or justice? If a treaty between two states, founded in admitted mistake, is binding, why not a treaty founded in fraud? If fraud or mistake will not vitiate a treaty between states, will it vitiate any other contract? Without entering into this subject, we merely express one dissent to the whole doctrine. Our main answer to it is, that in 1710, and 1718, Massachusetts and Rhode Island were not sovereign and independent states, but colonial governments, with powers of an extremely limited character. They were trustees of legislative powers, under a grant from another nation, made for the benefit of the people.

No agreement in relation to their jurisdiction, even though made fairly and understandingly, could bind the crown, until ratified by the crown. How then could an agreement made under an admitted mistake, be allowed a more binding efficacy, than an agreement made understandingly? Besides, it is expressly averred in the bill, that neither of these agreements were even ratified by the crown; and the demurrer admits that fact.

We have not merely the admission of Massachusetts, that these agreements were founded in mistake, but the mistake is apparent on the face of the agreements themselves. The agreement of 1810, states, expressly, that they were to begin the line, from the Woodward and Saffrey station, "being three English miles distant from the southernmost part of Charles river, agreeable to the letters patent." There was never any dispute between the parties, but that the line was to be three miles south of the river, and no more. That was the agreed basis of the contract. The only dispute was, what course that line should run; Rhode Island contending for a due west course, and Massachusetts for a course south of west.

The question, therefore resolves itself into this; can an agreement founded in an admitted mistake, or a mistake apparent

upon the face of the instrument, be supported either in law or equity? For a much stronger reason, can such an agreement between parties, having no power to contract in relation to the subject-matter, be supported?

An omission in an agreement, by mistake, stands on the same ground as an omission by fraud. Ramsbottom v. Gosden, 1 Ves. and Beam. 168. 3 Atk. 388. 6 Ves. 334, note C.

"The general rule is, that an act done, or contract made under a mistake, or ignorance of a material fact, is voidable and relievable in equity." Story's Equity Jurisprudence, 155. 9 Ves. Jun., 275. Bingham v. Bingham, 1 Ves. Sen., 126. Gee v. Spencer, 1 Vern. 32.

Cocking v. Pratt, 1 Ves. Sen., 400, is a strong case, resembling the present, in many of its features. Honor v. Honor, 1 P. Williams, 123, is also applicable to the present case. Articles, and a settlement in pursuance thereof, were both made before marriage, but the settlement varied from the uses of the articles. Decreed to set the settlement aside. Chancellor: "It is a plain mistake in varying the settlement from the articles, and this appearing upon the face of the papers, and the plain reason of the thing, length of time is immaterial." In the case before the Court, the mistake is admitted. It also appears upon the face of the agreements. The case of Leonard v. Leonard, 2 Ball and Beatty's Reports, was a case of compromise. Lord Manners said that "the plaintiff acted under an evident mistake. The defendant cannot be permitted to hold an estate which manifestly belongs to the plaintiff; and which the defendant has obtained either by the mistake or misrepresentation of the agent."

We shall dismiss this part of the case, and very briefly consider the question, whether length of time affords any defence to Massachusetts. We have various answers to the argument, from time. In the first place, time is no objection to relief, where the mistake is admitted; if the case arises between the original parties to the contract; and if the plaintiff has not misled the defendant, by concealing the mistake an undue time, after it was discovered. In the present case, it is admitted that Rhode Island disclosed the mistake as soon as it was discovered. It comes within the principle of Honor v. Honor, 1 P. Williams,

123; the mistake "being apparent on the face of the papers, length of time is immaterial."

In the second place, length of time, though a bar in some cases to a claim for property, does not affect a claim for jurisdiction.

These are questions, however, more proper to be discussed, when the general merits of the case come before the Court, upon a general denial of the plaintiff's bill. The principal question upon these pleadings is, whether length of time can be taken advantage of, upon a demurrer? As this is a mere question of authority, we shall content ourselves with a reference to such cases as bear most strongly upon the point.

Both in law and in equity, time has a twofold operation; often confounded by unskilful persons; but possessing, in reality, characters wholly distinct, and wholly unlike each other. In many cases, it operates as a bar to the plaintiff's remedy. In a class of cases more numerous, it operates as a witness in favour of the defendant. In this last mode of its operation, it has nothing to do with the remedy, but it is applied to the merits of the plaintiff's claim.

In its first mode of operation, it is called a statute of limitations; and unless the case is embraced by certain enumerated exceptions, such as infancy, coverture, and other disabilities, which must be specially stated in answer to the special plea of the defendant, it is an unyielding and peremptory bar to the plaintiff's action. Still, the demand exists for certain purposes, although the remedy is destroyed. It still would form a sufficient consideration for a new promise.

But, in its second mode of operation, it is not necessary to plead the lapse of time relied upon. It is introduced as a witness in the cause before the jury; and, like all other witnesses, its testimony may be contradicted or qualified in a thousand ways, because it swears to matters of fact alone. Thus, in cases in which twenty years operate as presumptive evidence of a grant; the opposite party may disprove the existence of the grant, or remove the presumption by any means in his power, and the jury are to judge of the weight of conflicting testimony.

But a plea of the statute of limitations, if admitted by the plaintiff, that is, if he admits that the time has elapsed, and that

his case does not come within one of the specified exceptions, is matter of mere law, to be decided by the Court. A statute of limitations prescribes a definite time, six years, or twenty years, beyond which no action can be brought. It operates alike in all cases, and if the lapse of time is admitted, is fatal to the plaintiff's case. No circumstances can ward off its unerring blow. But when time operates as evidence addressed to a jury, the plaintiff may safely admit the lapse of twenty, thirty, or fifty years, and destroy its effect in a thousand different modes.

In Courts of Law, a statute of limitations must be specially pleaded. Even if it appears upon the face of the declaration, that more than the prescribed time has elapsed, still the defendant must present it anew, in a special plea. But in those cases, in which Courts of Equity have concurrent jurisdiction with Courts of Law, and in which a statute of limitations applies; if it appear upon the face of the bill that the prescribed time has elapsed, and the disabilities mentioned in the statute, are not stated in the bill in avoidance of the bar, the defendant may demur to the bill. This difference in the mode of pleading the statute in the two Courts is simply this, that in a Court of Law the statute must be pleaded by the defendant, and the disabilities, if any, introduced in the plaintiff's replication. But in a Court of Equity, if the lapse of time is apparent on the face of the bill, the disabilities in avoidance must also be stated, otherwise the defendant may demur to the whole bill.

In the case now under consideration, it is not pretended that time operates as a bar. If the case had been on the law side of the Court, there is no statute of limitations that could be pleaded in bar to the remedy. There is no provision in any statute in England, or this country, applicable to the subject-matter of this suit, jurisdiction, nor to the parties, sovereign states. Time, therefore, can only come to the aid of the defendant as a witness, to prove possession on the part of the defendant, and acquiescence on the part of the plaintiff. Like all other witnesses, his testimony must be offered to the jury upon an issue of fact, and not to the Court upon an issue of law.

In the case of Deloraine *v.* Brown, 3 Brown's Ch. Cases, 646, (London edition of 1819, by Eden,) is a note of Lord Thurlow'

opinion, preserved by Redesdale, which places this question in its true light.

"The party who demurs," said his lordship, "admits every thing that is well pleaded, in manner and form as pleaded; and a demurrer ought, therefore, in a Court of Law, to bring before the Court a question of mere law; and in a Court of Equity a question of law or equity merely. The demurrer, therefore, must be taken to admit the whole case of fraud made by the bill, and the argument to support it must be, not that a positive limitation of time has barred the suit, for that would be a pure question of law, but that, from long acquiescence, it should be presumed that the fraud charged did not exist, or that it should be intended that the plaintiff had confirmed the transaction. This must be an inference of fact, and not an inference of law, and the demurrer must be overruled, because the defendant has no right to avail himself by demurrer of an inference of fact, upon matter upon which a jury in a Court of Law would collect matter of fact to decide their verdict, or a Court would proceed in the same manner in equity. What limitation of time will bar a suit, where there is no positive limitation, or under what circumstances the lapse of time ought to have that effect, must depend upon the facts of the particular case, and the conclusion must be an inference of fact, and not an inference of law, and therefore cannot be made on demurrer. But where the defence is not a presumption, from long acquiescence, but a positive limitation of time, which the Court, by analogy to the statute of limitation, adopts, it may clearly be taken advantage of by demurrer."

In the case of Hóvenden v. Lord Annesly, 2 Schoale and Lefroy, 629, it was decided, that in cases of a positive limitation of time as a bar to the remedy, a demurrer to the bill would be sustained. That case was decided by Lord Redesdale, in 1806. In the edition of Lord Redesdale's Treatise upon Equity Pleading, by Jeremy, the edition of 1836, (revised by Redesdale himself,) page 212, the distinction taken in the above note and opinion of Thurlow, is maintained.

Mr. Justice Story, in his very able Treatise upon Equity Pleading, p. 378, states the doctrine with great clearness. "The same principle," he says, "will apply to a bill which states a

case within the statute of limitations at law, and upon which Courts of Equity follow the analogy of the law, for, under such circumstances, Courts of Equity hold that the objection may be taken as a defence by demurrer."

In one of the latest treatises upon Chancery Practice, by Daniels, (published in 1838, London edition,) pages 43 and 44, all the decisions upon this subject are cited, and they show conclusively that a demurrer can be sustained in cases analogous to the statute of limitations.   But he says,

" It is to be remarked here, that all the above cases were decided upon the ground of their coming within the statute of limitations, or the rules of the Court which have been adopted in analogy to the statute, and that therefore there was a positive limitation of time upon which the Court could proceed.  Where, however, there is no such positive limitation, the question whether the Court will interfere or not, depends upon whether, from the facts of the case, the Court will infer acquiescence, or confirmation, or release.   Such inference is an inference of fact and not of law, and cannot be raised on demurrer."   He cites Cuthbert v. Creasy, Mad. and Geld's Rep. 189, as a recent decision of the English Chancery upon this very point.

Upon the mere technical law of pleading, therefore, we feel great confidence that no advantage of time can be taken in the present case, by demurrer.

: But, besides the mere technical objection, there are reasons lying close to the merits of the case, which show conclusively that extreme injustice would be done to Rhode Island, to allow the lapse of time to be taken advantage of under a demurrer. We have stated in our bill that Massachusetts took possession of the territory in dispute in 1719, and has continued in possession ever since.   But we have also stated various matters in avoidance of this possession.

In page 43 of the printed case it is stated " that the said province of Massachusetts, on or about the 14th of May, 1719, wrongfully took possession of all that tract, &c."   " And has since continued, wrongfully, to exercise jurisdiction over the same."

The bill then proceeds to state that the line established by the agreement of 1719, was never confirmed by Rhode Island,

[Rhode Island v. Massachusetts.]

"but that, on the contrary, the claim of said colony, uniformly was, that the true dividing line on the north part of said colony, was a line drawn three English miles, and no more, south of the south part of said Charles river, or of any or every part thereof, as defined and granted by the letters patent aforesaid; and that the claim of Massachusetts to any other or different line was never acquiesced in, or consented to, by said colony of Rhode Island; and that the said claim of the said colony was publicly and frequently urged and maintained by said colony, and by the freemen and inhabitants thereof."

Here are clear and distinct allegations of facts. The demurrer admits the truth of them. It admits that Rhode Island never acquiesced in the possession or claim of Massachusetts, but always maintained her claim for the charter line as now contended for.

This demurrer admits the facts of non-acquiescence. It admits the truth of all evidence which the plaintiff by any possibility can offer, under that general allegation. The very question as to time in this case is, has Rhode Island acquiesced in the possession of Massachusetts? In her bill she says she has not; and she has a right to offer any and all evidence which tends to prove that fact. But the demurrer excludes that evidence by admitting the fact itself. It will not answer to admit the fact in pleading, and deny it in the argument. It must be denied in pleading, so that Rhode Island may offer her evidence, or it cannot be denied at all. Can it then be gravely contended by the learned counsel of the very lofty and imposing state of Massachusetts, that agreements entered into under a clear and admitted mistake, caused by her own misrepresentations, can stand for one moment in any Court, in any civilized nation in the world? Can it be contended, that any length of possession under such agreements, admitted to have been wrongfully taken in the first instance, wrongfully continued, and never acquiesced in by Rhode Island, can confer upon Massachusetts any title? Our difficulty has been to find, in the whole range of the case, a spot of debatable ground.

Mr. Webster, in support of the demurrer.

The bill of Rhode Island asks the Court to disturb a boundary

between that state and Massachusetts, which has been settled for more than two hundred years. This is a question of great magnitude; and the matter for the decision of the Court is, whether a case has been made out in the bill on which Massachusetts may resist the claim thus presented.

The charter of Massachusetts originated in a grant by the council established at Plymouth, on the 19th of March, 1628, to Sir Henry Rosewell and others; by which the soil and jurisdiction of the territory, now belonging to the commonwealth of Massachusetts, was granted to a southern boundary; to run three miles south of Charles river. In 1663, the province of Rhode Island was granted by King Charles II., and the grant was limited to, and by the southern boundary of the colony of Massachusetts.

As to the exact location of this boundary, difficulties arose, and commissioners were appointed by Rhode Island and Massachusetts; and in 1719 agreements were made by the commissioners of both parties.

What is the ground on which these agreements are to be set aside? It is said to be that they were founded in mistake; and that by them Massachusetts has gained, and Rhode Island has lost four miles of territory. This is the whole ground. No fraud is charged, none is alleged. No assertion is made in the bill that advantage was taken by Massachusetts in the adjustment; or that the Commissioners of Rhode Island had not knowledge of the subject confided to them: and if they had been ignorant, it would not avail. They had full right and full opportunity to make all necessary examinations.

It is said that, under the mistake, the line was placed seven miles from Charles river, instead of three miles. Rhode Island discovered the mistake in 1749, and that the proceedings set forth in the bill, show that Rhode Island has not acquiesced in the line then established; the object of this application to the Court is to obtain relief from the mistake discovered in 1749.

The question is, whether this Court can interfere after so long a period; whether time alone will not prevent the disturbance of an adjustment of such long standing, and in reference to which no adverse movement has been made for nearly one hundred years; and as to which nothing has been done by Rhode

Island, other than expressions of dissatisfaction. If it were a recent transaction, no adjudged cases are known to sustain the application; and no principles of public law will sanction the interference of the Court. If it was an affair of yesterday, the Court would not act upon it.

Several things were to be ascertained by the commissioners. The course of Charles river and its branches, and then a line running three miles south of the river. This was the established charter boundary of Massachusetts, to which the northern line of Rhode Island was limited by her charter, granted many years after that of Massachusetts. After all the investigation the commissioners thought necessary, they adopted the Woodward and Saffrey station, as the point which was to determine the boundary line; a point which had been fixed twenty years before the existence of Rhode Island. No misrepresentations are charged to the commissioners of Massachusetts; no interference with the inquiries which the Rhode Island commissioners might be desirous of making; and the determination of the question was made after every opportunity for examination. If a mistake was made, which is not admitted, can relief from it be now obtained, where no fraud is imputed.

The cases in the books sustain the views of the counsel for the state of Massachusetts. If better knowledge exist in one party to an agreement than in the other, the agreement will not be disturbed. 9 Ves. 273. If parties are dealing, and both have equal opportunities of knowledge, the Court will not interfere. In this case there were no confidential relations between the parties. They were dealing adversely. 1 Ves. Jr., 408.

If men have agreed to a boundary between them, and it may be afterwards disturbed on the ground of mistake, the consequences would be disastrous, and fatal to the tranquil ownership of estates. Boundaries must be settled for the assurance of cultivation. The husbandman would refuse to improve his land, unless he was at rest on the subject of the lines and corners of his property. If these principles regulate the concerns of individuals, how much more necessary are they in the relations between coterminous states. This is supported by the writers on international law. Vattell says, the agreements between nations, however mistaken, are to stand. If this is not so, how shall such

disputes be at any time adjusted. The books, and all history, are full of these principles.

Mr. Webster referred to the controversy between William Penn and Lord Baltimore, in support of these principles; the settlement of the disputes as to boundaries between the states of Kentucky and Tennessee; and to other cases. Will any one say these adjustments, and the lines established under them, can now be disturbed on the ground of mistake? It is said the bill of Rhode Island charges the mistake, and the demurrer admits it; and, therefore, the whole case of the complainants is admitted. The question to be decided by the Court is not whether the mistake is admitted, but what is the effect of the mistake. The mistake is immaterial, and this is submitted to the Court. If the mistake could not entitle the complainant to relief, its admission would not do so.

If there had been a fraud; if the commissioners of Rhode Island had been deceived, there is no ground for relief. It is too late, at this distant period, to inquire into such a transaction.

This brings the Court to the inquiry, what is the effect of lapse of time? But it is said the demurrer will not permit the party to avail himself of lapse of time. In order to do this, an answer must be put in. But the lapse of time is on the face of the complainant's bills; and when this is so, it will avail the party demurring.

This is a question of pleading. The Court has adopted the rules and principles of the Court of Chancery in England; and they will regard the decisions of the English Courts of Chancery on this question. It has been settled in these Courts for half a century. The case of Foster *v.* Hodgson, 19 Ves. 180—184, determines this point: cited also, 1 Vesey and Beame, 535, 536. 7 Paige, 195. 6 Paige, 590. 2 Schoales and Lefroy, 630. Story's Equity Pleading, 378. 389.

The defendant, the state of Massachusetts, is right, therefore, in the form of pleading; and lapse of time, possession, and acquiescence, are a complete bar against fraud. The bill states that the mistake was discovered in 1749, and no proceedings took place in this Court until 1835—eighty-six years afterwards!

There are two modes in which lapse of time may be taken advantage of in Courts of Equity. The first, where the law

expressly applies to the case. A Court of Equity then adopts
the same rule. 2 Jacobs and Walker, 191. 2 Story's Equity
Jurisprudence, 735. Second, wherever there has been laches,
the statute of limitations will be applied by Courts of Chancery.
Story, 735, 736. In this case, both rules apply. There has been
most abundant laches. Why did not Rhode Island apply to the
Privy Council—to the Continental Congress—to this Court, esta-
blished in 1789? This is acquiescence; no matter what the com-
plainants say, it is acquiescence. Such a course of acquiescence
cures fraud, if any fraud had existed. 2 Story's Equity, 739,
note; cited also, Story's Equity Pleadings, 379. 9 Peters, 405.
Bourn *v.* Chiles, 10 Peters, 177. 1 Story's Equity, 139. 189.
502. 2 Sch. and Lef. 636. The complainants assert that lapse
of time is only evidence against their title, but the demurrer of
the defendant takes away the operation of the evidence. This
cannot be, or there would be no demurrer for lapse of time on
the face of the bill. But Courts of Equity adopt a higher prin-
ciple. They will not assist a plaintiff to maintain a stale claim.
They will save a party from the trouble of resisting such de-
mands. It is manifest, then, that if there was mistake; if there
was fraud; no relief will be granted after such a lapse of time.
There is another and an important point for the consideration
of the Court in this case.

The Constitution gives the Supreme Court a right to decide
controversies between the states of the Union. This is a case
in which two states having agreed to an actual and defined
boundary, nearly one hundred years ago, come before the Court,
and the Court is asked to disturb this boundary established be-
fore the states came into the confederacy—to change the limits
of the territory each possessed when she entered into it—can
this Court interfere in such a matter? Each of the states, took
her position in the Union holding the territory now held, with the
actual boundaries to their territories well known and long esta-
blished. Independence was declared by the states with these
limits. The treaty of peace in 1783 acknowledged the states as
they then existed. No disturbance can be made of the territo-
ries of each state after this mutual recognition, and after this ac-
knowledgment by the nation, to which, before the Declaration of
Independence and the treaty of peace, they were subject. No

tribunal which has its existence under a constitution of government formed after these relations existed, has power to interfere between them in such a question.

Mr. Chief Justice TANEY delivered the opinion of the Court.

The attention of the Court has on several occasions been drawn to this case by the important questions which have arisen in different stages of the proceedings. At the last term, it came before us upon a plea in bar to the complainant's bill, which upon the motion of the complainant had been set down for argument.

This part of the case is reported in 14 Peters, 210, where the allegations contained in the bill are so fully set out that it is unnecessary to repeat them here. The Court having overruled the plea for the reasons stated in the report of the case, the defendant has since demurred; and in this state of the pleadings the question is directly presented, whether the case stated by Rhode Island in her bill, admitting it to be true as there stated, entitles her to relief.

The character of the case, and of the parties, has made it the duty of the Court to examine very carefully the different questions which from time to time have arisen in these proceedings. And if those which are brought up by the demurrer were new to the Court, or if the judgment now to be pronounced would seriously influence the ultimate decision; we should deem it proper to hold the subject under advisement until the next term, for the purpose of giving to it a more deliberate examination.

But although the questions now before the Court did not arise upon the plea, and of course were not then decided, yet much of the argument on that occasion turned upon principles which are involved in the case as it now stands. The facts stated in the bill were brought before us, and the grounds upon which the complainant claimed relief were necessarily discussed in the argument at the bar, and the attention of the Court strongly drawn to the subject. The whole case as presented by the bill and demurrer has been again fully and ably argued, at the present term; and as the Court has made up its opinion, and are satisfied that the delay of our judgment to the next term would not enable us to obtain more or better light upon the subject, it would be useless to postpone the decision.

z 2

The demurrer admits the truth of the facts alleged in the bill, and it is sufficient for the purposes of this opinion to state in a few words the material allegations contained in it.

1st. It alleges that the true boundary line between Massachusetts and Rhode Island, by virtue of their charters from the English crown, is a line run east and west three miles south of Charles river, or any or every part thereof; and sets out the charters which support, in this respect, the averments in the bill.

2d. That Massachusetts holds possession to a line seven miles south of Charles river, which does not run east and west, but runs south of a west course; and that the territory between this line and the true one above mentioned, belongs to Rhode Island, and, that the defendant unjustly withholds it from her.

3d. That Massachusetts obtained possession of this territory under certain agreements, and proceedings of commissioners appointed by the two colonies, which are set out at large in the bill; and the complainant avers that the commissioners on the part of Rhode Island, agreed to this line under the mistaken belief that it was only three miles south of Charles river; and that they were led into this mistake by the representations made to them by the commissioners on the part of Massachusetts, upon whose statement they relied.

4th. That this agreement of the commissioners was never ratified by either of the colonies: and the bill sets out the various proceedings of the commissioners and legislatures of the two colonies, which if not sufficient to establish the correctness of the averment, are yet not incompatible with it.

5th. The bill further states that the mistake was not discovered by Rhode Island until 1740, when she soon afterwards took measures to correct it; that she never acquiesced in the possession of Massachusetts, after the mistake was discovered, but has ever since continually resisted it; and never admitted any line as the true boundary between them, but the one called for by the charters. Various proceedings are set out, and facts stated in the bill, to show that the complainant never acquiesced; and to account for the delay in prosecuting her claim. Whether they are sufficient or not for that purpose, is not now in question. They are certainly consistent with the averment, and tend to support it.

The case. then, as made by the bill, and to be now taken as true, is substantially this: The charter boundary between these colonies was three miles south of Charles river; and the parties intending to mark a line in that place, marked it by mistake, four miles further south, encroaching so much on the territory of Rhode Island; and the complainant was led into this mistake by confiding in the representations of the commissioners of the defendant. And as soon as the error was discovered, she made claim to the true line, and has ever since contended for it.

We speak of the case as it appears upon the pleadings. It may prove to be a very different one, hereafter, when the evidence on both sides is produced. But taking it as it now stands, if it were a dispute between two individuals, in relation to one of the ordinary subjects of private contract; and there had been no laches to deprive the party of his title to relief; would a Court of Equity compel him to abide by a contract entered into under such circumstances? It is one of the most familiar duties of the Chancery Court to relieve against mistake, especially when it has been produced by the representations of the adverse party. In this case, the fact mistaken, was the very foundation of the agreement. There was no intention on either side to transfer territory, nor any consideration given by the one to the other to obtain it. Nor was there any dispute arising out of conflicting grants of the crown, or upon the construction of their charters, which they proposed to settle by compromise. Each party agreed that the boundary was three miles south of Charles river; and the only object was to ascertain and mark that point: and upon the case, as it comes before us, the complainant avers, and the defendant admits that the place marked, was seven miles south of the river, instead of three, and was fixed on by mistake; and that the commissioners of Rhode Island were led into the error, by confiding in the representations of the Massachusetts commissioners. Now, if this mistake had been discovered a few days after the agreements were made, and Rhode Island had immediately gone before a tribunal, having competent jurisdiction, upon principles of equity, to relieve against a mistake committed by such parties, can there be any doubt that the agreement would have been set aside, and Rhode Island restored to the true charter line? We think not. Agreements thus obtained,

cannot deprive the complainant of territory, which belonged to her before; unless she has forfeited her title to relief, by acquiescence or unreasonable delay.

But it has been argued, on the part of the defendant, that assuming the agreement to have been made by mistake, and that the complainant would have been entitled to set it aside, if she had prosecuted her claim within a reasonable time; yet, as Massachusetts entered into the disputed territory immediately after the agreement, and has held it ever since, the complainant is too late in seeking relief: that after such a lapse of time, she is barred by prescription, or must be presumed to have acquiesced in the boundary agreed upon; and that if she did not acquiesce, she has been guilty of such laches and negligence in prosecuting her claim, that she is no longer entitled to the countenance of a Court of Chancery.

The answer to this argument is a very plain one. The complainant avers that she never acquiesced in the boundary claimed by the defendant, but has continually resisted it since she discovered the mistake; and that she has been prevented from prosecuting her claim at an earlier day, by the circumstances mentioned in her bill. These averments and allegations, in the present state of the pleadings, must be taken as true; and it is not necessary to decide now, whether they are sufficient to excuse the delay. But when it is admitted by the demurrer that she never acquiesced, and has from time to time made efforts to regain the territory by negotiations with Massachusetts, and was prevented by the circumstances she mentions from appealing to the proper tribunal to grant her redress; we cannot undertake to say, that the possession of Massachusetts has been such as to give her a title by prescription: or that the laches and negligence of Rhode Island have been such as to forfeit her right to the interposition of a Court of Equity.

In cases between individuals, where the statute of limitations would be a bar at law, the same rule is undoubtedly applied in a Court of Equity. And when the fact appears on the face of the bill, and no circumstances are stated, which take the case out of the operation of the act; the defendant may undoubtedly take advantage of it by demurrer, and is not bound to plead or answer. The time necessary to operate as a bar in equity, is

fixed at twenty years, by analogy to the statute of limitations; and the rule is stated in Story's Com. on Eq. Pl. 389, and is supported and illustrated by many authorities cited in the notes. It was recognised in this Court in the case of Elmendorf *v.* Taylor, 10 Wheat. 168–175. But it would be impossible with any semblance of justice to adopt such a rule of limitation in the case before us. For here two political communities are concerned, who cannot act with the same promptness as individuals; and the boundary in question was in a wild unsettled country, and the error not likely to be discovered, until the lands were granted by the respective colonies, and the settlements approached the disputed line: and the only tribunal that could relieve after the mistake was discovered, was on the other side of the Atlantic, and was not bound to hear the case and proceed to judgment, except when it suited its own convenience. The same reasons that prevent the bar of limitations, make it equally evident, that a possession so obtained, and held by Massachusetts, under such circumstances, cannot give a title by prescription.

The demurrer, therefore, must be overruled.

But the question upon the agreements, as well as that upon the lapse of time, may assume a very different aspect, if the defendant answers and denies the mistake; and relies upon the lapse of time as evidence of acquiescence, or of such negligence and laches as will deprive the party of his right to the aid of a Court of Equity. It will then be open to him to show that there was no mistake; that the line agreed on is the true charter line; or that such must be presumed to have been the construction given to the charters by the commissioners of both colonies; or that the agreement was the compromise of a disputed boundary, upon which each party must be supposed to have had equal means of knowledge.

So, too, in relation to the facts stated in the bill to account for the delay. It will be in the power of the complainant to show, if she can, that her long continued ignorance of an error, (which, if it be one, was palpable and open,) was occasioned by the wild and unsettled state of the country; and that the subsequent delay was produced by circumstances sufficiently cogent to justify it upon principles of justice and equity; or was assented to by

[Rhode Island *v.* Massachusetts.]

Massachusetts, or occasioned by her conduct. And, on the other hand, it will be the right of the defendant to show, if she can, that Rhode Island would not have been ignorant of the true position of this line until 1740; or, if she remained in ignorance until that time, that it must have arisen from such negligence and inattention to her rights, as would render it inexcusable; and should be treated, therefore, as if it had been acquiescence with knowledge: or she may show that, after the mistake is admitted to have been discovered, Rhode Island was guilty of laches, in not prosecuting her rights in the proper forum, and that the excuses offered for the delay are altogether unfounded or insufficient; and that Massachusetts never assented to it, nor occasioned it.

We state these questions as points that will remain open upon the final hearing, for the purpose of showing that the real merits of the controversy could not have been finally disposed of upon the present pleadings; but without meaning to say that other questions may not be made by the parties, if they shall suppose them to arise upon the proceedings hereafter to be had. The points above suggested, which are excluded by the case as it now stands, make it evident that this controversy ought to be more fully before the Court, upon the answer, and the proofs to be offered on both sides, before it is finally disposed of.

The Court will, therefore, order and decree that the demurrer be overruled; and that the defendant answer the complainant's bill on or before the first day of August next.

This cause came on to be heard on the amended bill and demurrer, and was argued by counsel. On consideration whereof, it is now here ordered by this Court, that the said demurrer be, and the same is hereby, overruled; and it is also now further here ordered by this Court that the defendant answer the bill of complaint as amended, on or before the first day of August next.